## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

SLEP-TONE ENTERTAINMENT
CORPORATION,
     Plaintiff,

     v.                                              **Civil Action No. 5:11cv32**

FAYE JOHNSON; PARADISE MOON
ENTERTAINMENT INC; HI-NOTE
ENTERTAINMENT, INC.; CHARLES A.
MCCONNIEL; ROBERT GERHART;
TOUCAN ENTERTAINMENT; ANDREW
COUCHE; PATRICE COUCHE; OUTLAW
KARAOKE; DAVID NOTHSTINE;
ELIZABETH NOTHSTINE; MOBILE
MUSIC EXPRESS LLC; STEVE JARVIS; D
& D'S PUB, INC.; DANIEL BRANCH;
MAROG ENTERTAINMENT; ROGER
DREWIS; MARGARET DREWIS; CHRIS
CONRAD; BRENDA BREININGER;
MICHAEL ANGELO MINCIELI; MARK
FLEMING; SEAN COREY
ENTERTAINMENT, LLC; ISLAND
ENTERTAINMENT, LLC; DEANA
JENNINGS; MICHELE BROWNING;
JAMES ALLEN; REUBEN JENKINS;
NICHOLAS SILEO; SPOTLIGHT
ENTERTAINMENT; DENISE USSERY;
FRANK USSERY; SUSAN BADGLEY;
MONA LISA ITALIAN RESTAURANT,
PIZZA AND LOUNGE; GIUSEPPE
PIRRONE; ROSALIA PIRRONE; JIM &
SUSIE'S KARAOKE; JAMES ST. ONGE;
and SUSAN ST. ONGE,
     Defendants.

## COMPLAINT

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned counsel, complains of the Defendants and for its complaint alleges as follows:

## INTRODUCTION

Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the name "Sound Choice." Slep-Tone was founded 25 years ago by Kurt and Derek Slep, two brothers with a vision to nurture the development of karaoke in America as a participatory entertainment phenomenon. During that time, Sound Choice came to be recognized as one of the leading producers of high-quality karaoke accompaniment tracks. The company invested over $18 million to re-record and replicate the authentic sound of popular music across different eras and genres of music.

The Sleps' dedication to producing music of the highest quality and the most authentic character led its music to become the staple of almost every karaoke show in the country. As karaoke grew in popularity, Sound Choice became the brand that nearly every karaoke fan wanted to sing and that nearly every karaoke jockey ("KJ") wanted in his or her library.

KJs play karaoke songs using compact discs containing files written in one of two special encoded formats, either "CD+G" ("compact disc plus graphics") or

"MP3G" ("MP3[1] plus graphics"), in which the disc contains the music and the lyrics, which will display on a screen.  In recent years, computer technology, cheap file memory devices, and the internet have made it possible for karaoke discs to be decoded and "ripped" (copied) to a user's hard drive and easily copied and distributed between KJs.  This technology has proven irresistible to KJs, many of whom have used this opportunity to copy one purchased disc to several different computer based systems, copy a singer's personal discs if they use them during a show, "swap" song files among each other, download them from illegal file-sharing sites and build libraries of tens of thousands of karaoke songs without paying for them.  Whereas in the past a KJ would buy multiple copies of an original disc if he or she desired to operate multiple systems, now they simply "clone" their songs for multiple commercial systems or even their entire karaoke song libraries to start a new operation.   Additionally, many KJs or operators starting in the business simply buy computer drives pre-loaded with thousands of illegally copied songs.

These practices have become so widespread that Slep-Tone and its sister company, Sound Choice Studios, Inc., have been driven nearly out of business.  At its peak, the Sound Choice family of companies employed 75 individuals and

---

[1] MP3 is an acronym standing for "Moving Picture Experts Group Audio Layer 3." MP3G is a far newer format than CD+G and is significantly more portable than CD+G.  The Plaintiff has only recently begun distributing its karaoke tracks in this format, and only under tight contractual controls that require user registration and audits, confine possession to professional karaoke operators, include serialization of licensed discs, and prohibit file sharing under pain of forfeiture of license rights.

produced as many as 5 new karaoke discs per month.  Today, the enterprise

employs fewer than 10 individuals.  Sound Choice Studios, which is responsible

for production of new material, has virtually ceased making new discs, because the

companies have lost money on every recent new karaoke disc.  The most recent

new disc did not produce enough revenue even to cover the production and

licensing costs associated with it—yet the songs from that disc can be found on as

many as 30,000 karaoke systems around the United States.

For KJs, karaoke is a commercial enterprise.  KJs who legitimately acquired

all of their music at great cost are being forced by illicit competition to produce

shows for lower and lower fees.  Illegitimate competitors offer libraries of tens of

thousands of songs, which would have cost $50,000 to $100,000 or more to

acquire legitimately, but produce shows for one-third the rates a legitimate KJ can

offer.  The result is significant financial pressure on once-legitimate KJs to skirt or

ignore the law and become pirates, simply to stay in business.

Slep-Tone has been forced to undertake this litigation in order to ensure that

it survives and continues to produce the high-quality karaoke music its fans

demand and to level the playing field for the legitimate KJs.

## JURISDICTION AND VENUE

1.     This is an action for trademark infringement and unfair competition arising

        under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and

1125.  This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.     This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to the Plaintiff's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.     This Court has supplemental jurisdiction over the subject matter of the Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), in that those claims are so related to the Plaintiff's federal claims that they form part of the same case or controversy.

4.     Alternatively, this Court has jurisdiction over the subject matter of the Plaintiff's state-law claims pursuant to 28 U.S.C. § 1332(a), in that this is an action between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the defendants reside in this State, and at least one of the defendants resides in this judicial district.

## **THE PLAINTIFF**

6.      Plaintiff SLEP-TONE is a North Carolina corporation having its principal

place of business at 14100 South Lakes Drive, Charlotte, North Carolina.

## **THE DEFENDANTS**

7.      Defendant FAYE JOHNSON is an individual who does business as "Music

By Faye" and who has her principal business address in Bradenton, Florida.

Defendant FAYE JOHNSON is engaged in the business of providing

karaoke entertainment, and she conducts her business activities at multiple

venues in this State.

8.      Defendant PARADISE MOON ENTERTAINMENT INC is a Florida

corporation with its principal business address in Bradenton, Florida.

Defendant PARADISE MOON ENTERTAINMENT INC is in the business

of providing karaoke entertainment and conducts its business activities at

multiple venues in this State.

9.      Defendant HI-NOTE ENTERTAINMENT, INC. is a Florida corporation

who does business as "Hi-Note Karaoke, Inc." with its principal business

address in Port Saint Lucie, Florida.  Defendant HI-NOTE

ENTERTAINMENT, INC. is in the business of providing karaoke

entertainment and conducts its business activities at multiple venues in this

State.

6

10. Upon information and belief, HI-NOTE ENTERTAINMENT, INC. was administratively dissolved on September 25, 2009, but continues to operate under that name.

11. Upon information and belief, Oliver Merwin, Heather Merwin, and Will Leffew are the co-owners of HI-NOTE ENTERTAINMENT, INC.

12. Defendant CHARLES A. MCCONNIEL is an individual who does business as "Night Al Productions" and who has his principal business address in Panama City Beach, Florida.  Defendant CHARLES A. MCCONNIEL is engaged in the business of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

13. Defendant ROBERT GERHART is an individual who does business as "Available Sound" and who has his principal business address in Sarasota, Florida. Defendant ROBERT GERHART is engaged in the business of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

14. Defendant TOUCAN ENTERTAINMENT is an unincorporated association and, upon information and belief, a general partnership whose general partners include at least Defendant ANDREW COUCHE and Defendant PATRICE COUCHE.

15.     Defendants ANDREW COUCHE and PATRICE COUCHE are individuals

who together operate Defendant TOUCAN ENTERTAINMENT, and who

have their principal business address in Bradenton, Florida. Defendant

TOUCAN ENTERTAINMENT and its general partners are engaged in the

business of providing karaoke entertainment, and they conduct their business

activities at multiple venues in this State.

16.     Defendant OUTLAW KARAOKE is an unincorporated association and,

upon information and belief, a general partnership whose general partners

include at least Defendant DAVID NOTHSTINE and Defendant

ELIZABETH NOTHSTINE.

17.     Defendants DAVID NOTHSTINE and ELIZABETH NOTHSTINE are

individuals who together operate Defendant OUTLAW KARAOKE, and

who have their principal business address in or around Vero Beach, Florida.

Defendant OUTLAW KARAOKE and its general partners are engaged in

the business of providing karaoke entertainment, and they conduct their

business activities at multiple venues in this State.

18.     Defendant MOBILE MUSIC EXPRESS LLC is a Florida limited liability

company having its principal place of business in Sarasota, Florida.

Defendant MOBILE MUSIC EXPRESS LLC is in the business of providing

karaoke entertainment and it conducts its business activities at multiple venues in this State.

19.   Defendant STEVE JARVIS is an individual who does business as "Digital Productions" and as "The Karaoke Experts" and who has his principal business address in or near Pensacola, Florida.  Defendant STEVE JARVIS is engaged in the business of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

20.   Defendant D & D'S PUB, INC. is a Florida corporation with its principal business address in Palmetto, Florida.  Defendant D & D'S PUB, INC. operates an eating and drinking establishment known as D & D's Pub, at which karaoke entertainment is provided.

21.   Upon information and belief, Defendant D & D'S PUB, INC. was administratively dissolved on September 26, 2008 but the eating and drinking establishment known as "D & D's Pub" continues in operation.

22.   Upon information and belief, Diane Brinker is the sole owner of D & D'S PUB, INC.

23.   Defendant DANIEL BRANCH is an individual who does business as "Be A Star Entertainment" and who has his principal business address in or near Palmetto, Florida.  Defendant DANIEL BRANCH is engaged in the

business of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

24. Defendant MAROG ENTERTAINMENT is an unincorporated association and, upon information and belief, a general partnership whose general partners include at least Defendant ROGER DREWIS and Defendant MARGARET DREWIS.

25. Defendants ROGER DREWIS and MARGARET DREWIS are individuals who together operate Defendant MAROG ENTERTAINMENT, and who have their principal business address in or near Sarasota, Florida. Defendant MAROG ENTERTAINMENT and its general partners are engaged in the business of providing karaoke entertainment, and they conduct their business activities at multiple venues in this State.

26. Defendant CHRIS CONRAD is an individual who does business as "Conrad's Karaoke" and who has his principal business address in or near Cape Coral, Florida.  Defendant CHRIS CONRAD is engaged in the business of providing karaoke entertainment.

27. Defendant BRENDA BREININGER is an individual who does business as "Brenda's Karaoke" and who has her principal business address in or near Fort Myers, Florida.  Defendant BRENDA BREININGER is engaged in the

business of providing karaoke entertainment, and she conducts her business activities at multiple venues in this State.

28.   Defendant MICHAEL ANGELO MINCIELI is an individual who does business as "Happy Time Entertainment" and who has his principal business address in or near Naples, Florida.  Defendant MICHAEL ANGELO MINCIELI is engaged in the business of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

29.   Defendant MARK FLEMING is an individual who does business as "Three M Karaoke" and who has his principal business address in or near Cape Coral, Florida.  Defendant MARK FLEMING is engaged in the business of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

30.   Defendant SEAN COREY ENTERTAINMENT, LLC is a Florida limited liability company having its principal place of business in Fort Myers, Florida.  Defendant SEAN COREY ENTERTAINMENT, LLC is in the business of providing karaoke entertainment and conducts its business activities at multiple venues in this State.

31.   Defendant ISLAND ENTERTAINMENT, LLC is a Florida limited liability company having its principal place of business in Bonita Springs, Florida. Defendant ISLAND ENTERTAINMENT, LLC is in the business of

providing karaoke entertainment and conducts its business activities at multiple venues in this State.

32. Defendant DEANA JENNINGS is an individual who does business as "Karaoke Chicks" and who has her principal business address in or near Naples, Florida.  Defendant DEANA JENNINGS is engaged in the business of providing karaoke entertainment, and she conducts her business activities at multiple venues in this State.

33. Defendant MICHELE BROWNING is an individual who does business as "Amazing Noise Productions" and who has her principal business address in or near Fort Myers, Florida.  Defendant MICHELE BROWNING is engaged in the business of providing karaoke entertainment, and she conducts her business activities at multiple venues in this State.

34. Defendant JAMES ALLEN is an individual who does business as "DJ Indy Mike" and as "James M Allen Entertainment" and who has his principal business address in or near Fort Myers, Florida. Defendant JAMES ALLEN is engaged in the business of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

35. Defendant REUBEN JENKINS is an individual who does business as "Rockin Reuben" and who has his principal business address in or near Fort Myers, Florida. Defendant REUBEN JENKINS is engaged in the business

12

of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

36.   Defendant NICHOLAS SILEO is an individual who does business as "Musicman Disc Jockey" and as "DJ Nick" and who has his principal business address in or near Cape Coral or Lehigh Acres, Florida. Defendant NICHOLAS SILEO is engaged in the business of providing karaoke entertainment, and he conducts his business activities at multiple venues in this State.

37.   Defendant SPOTLIGHT ENTERTAINMENT is an unincorporated association and, upon information and belief, a general partnership whose general partners include at least Defendant DENISE USSERY and Defendant FRANK USSERY.

38.   Defendants DENISE USSERY and FRANK USSERY are individuals who together operate Defendant SPOTLIGHT ENTERTAINMENT, and who have their principal business address in or around Bonita Springs, Florida. Defendant SPOTLIGHT ENTERTAINMENT and its general partners are engaged in the business of providing karaoke entertainment, and they conduct their business activities at multiple venues in this State.

39.   Defendant SUSAN BADGLEY is an individual who does business as "Badge Music & Productions" and who has her principal business address in

13

or near Fort Myers or Cape Coral, Florida.  Defendant SUSAN BADGLEY

is engaged in the business of providing karaoke entertainment, and she

conducts her business activities at multiple venues in this State.

40.    Defendant MONA LISA ITALIAN RESTAURANT, PIZZA AND

LOUNGE ("MONA LISA") is an unincorporated association and, upon

information and belief, a general partnership whose general partners include

at least Defendant GIUSEPPE PIRRONE and Defendant ROSALIA

PIRRONE.

41.    Defendants GIUSEPPE PIRRONE and ROSALIA PIRRONE are

individuals who together operate Defendant MONA LISA, and who have

their principal business address in or near Fort Myers, Florida. Defendant

MONA LISA and its general partners operate an eating and drinking

establishment at which karaoke entertainment is provided.

42.    Defendant JIM & SUSIE'S KARAOKE is an unincorporated association

and, upon information and belief, a general partnership whose general

partners include at least Defendant JAMES ST. ONGE and Defendant

SUSAN ST. ONGE.

43.    Defendants JAMES ST. ONGE and SUSAN ST. ONGE are individuals who

together operate Defendant JIM & SUSIE'S KARAOKE, and who have

their principal business address in or near Cape Coral, Florida. Defendant

JIM & SUSIE'S KARAOKE and its general partners are engaged in the business of providing karaoke entertainment, and they conduct their business activities at multiple venues in this State.

## BACKGROUND FACTS

44.    The term "karaoke" means "empty orchestra" in Japanese. Karaoke entertainment has grown into a multi-million dollar business in the United States.

45.    Karaoke compact disc plus graphics or MP3 plus graphics recordings contain re-created arrangements of popular songs for use as "accompaniment tracks."

46.    Typically, the lead vocal tracks in an accompaniment track are omitted so that a karaoke participant can sing along, as though he or she were the lead singer. In other situations, the lead vocal track by a sound-alike artist might be included, and some formats allow the lead vocal to be selectively muted upon playback so that the accompaniment track may be listened to either with or without the lead vocals.

47.    The "graphics" portion of a karaoke recording refers to the encoding of the recording with data to provide a contemporaneous video display of the lyrics to the song, in order to aid the performer.

48.     This graphics data is also utilized to mark the accompaniment tracks with the Sound Choice trademarks and to cause the Sound Choice trademarks to be displayed upon playback.

49.     Entertainers who provide karaoke services in bars, restaurants, and other venues are known as karaoke jockeys ("KJs"), karaoke hosts, or karaoke operators.  The services provided by KJs typically include providing the karaoke music and equipment for playback, entertaining the assembled crowd for warm-up purposes, and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment.

50.     Typically, a KJ will maintain a catalog of songs available for performance in order to aid participants in selecting a song to sing.

51.     Legitimate KJs purchase equipment and purchase or license compact discs containing accompaniment tracks and charge for the above-mentioned karaoke services.

52.     Many KJs, such as some of the present Defendants, obtain, copy, share, distribute and/or sell media-shifted copies of the accompaniment tracks via pre-loaded hard drives, USB drives, CD-R's, or the Internet.

53.   Neither SLEP-TONE nor any of its associated companies has ever authorized the digitization of its songs for commercial use in producing karaoke shows.

54.   SLEP-TONE tolerates, but does not authorize, the shifting of its accompaniment tracks from the original medium to another medium, such as a computer hard drive, provided that the KJ strictly follows SLEP-TONE's media-shifting policy by maintaining "one-to-one correspondence."

55.   "One-to-one correspondence" requires (1) that each track stored on an alternative medium have originated from an original Sound Choice compact disc; (2) that the tracks from the original Sound Choice compact disc be shifted to one, and only one, alternative medium at a time; (3) that the KJ maintain ownership and possession of the original Sound Choice compact disc while its content is shifted to the alternative medium; and (4) that the original Sound Choice compact disc not be used for any commercial purpose while its content is shifted to the alternative medium.

56.   The copying, sharing, distribution, and selling of media-shifted tracks is not accompanied by the payment of any royalty to SLEP-TONE, nor authorized by any license agreement.

57.   SLEP-TONE and its affiliated companies pay statutory and negotiated royalties to the owners of copyright in the underlying musical works for

17

their activities in legitimately creating, copying, distributing, and selling

compact discs containing karaoke accompaniment tracks.

58.   Those persons, including the Defendants, who illegitimately obtain, copy,

share, distribute, and/or sell media-shifted copies of the Plaintiff's

accompaniment tracks do not pay royalties to the owners of copyright in the

underlying musical works.

59.   SLEP-TONE and its affiliated companies have spent millions of dollars

building and maintaining studios, hiring artists, building a distribution

facility, paying royalties to copyright owners, building a company that is

capable of reliably producing high-quality karaoke versions of current and

historical musical hits, and building a brand that is one of the pre-eminent

brands in the industry.

60.   The widespread creation of counterfeit copies of SLEP-TONE's karaoke

discs has denied SLEP-TONE the benefit of its investments.

61.   These counterfeits include SLEP-TONE's registered trademarks, such that to

the consumers of the illegitimate KJs' services, the counterfeits are virtually

indistinguishable from genuine Sound Choice materials.

62.   For each of the several recent releases of new karaoke music by SLEP-

TONE, dozens of illegitimate copies of the contents of the disc have been

created, on average, for each legitimate copy sold.  SLEP-TONE, its

18

affiliated companies, and its licensors have lost a considerable amount of money due to this widespread piracy.

63.   Such widespread illegal copying of music has been made possible by improving and ever cheaper computer technology and memory devices and the easy distribution of digital content over the internet.

64.   Widespread pirating of songs has contributed to the loss of more than sixty jobs at the Plaintiff's location in Charlotte, North Carolina, as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

65.   Legitimate KJs spend thousands of dollars acquiring SLEP-TONE's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

66.   Illegitimate KJs, who acquire the songs in their libraries illegally, have an unfair advantage over legitimate KJs, because the illegitimate KJs are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of SLEP-TONE's tracks.

67.   Piracy therefore unfairly increases the profits of illegitimate KJs and unfairly decreases the profits of legitimate KJs, a condition that pressures legitimate KJs to either commit piracy instead of doing business with SLEP-TONE and other karaoke music producers or lose their shows to KJs offering more songs at cheaper prices to the same venues.

68.   Because of piracy, it is nearly impossible for legitimate KJs to compete against illegal KJs, who are able to provide less expensive karaoke services and a greater number of tracks due to their lower overhead costs.

## THE RIGHTS OF THE PLAINTIFF

69.   Plaintiff SLEP-TONE is the owner of U.S. Trademark Registration No. 1,923,448 for the trademark SOUND CHOICE.

70.   Plaintiff SLEP-TONE is also the owner of U.S. Trademark Registration No. 2,000,725, for a display trademark as follows:



71.   Plaintiff SLEP-TONE has, for the entire time its marks ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendants, with notice of its federal registrations through the consistent display of the symbol ® with its marks as used.

## ACTIVITIES OF DEFENDANTS

72.   SLEP-TONE's investigators observed each of the Defendants possessing, using, or authorizing or benefiting from the use and display of unauthorized counterfeit goods bearing the Sound Choice Marks, or providing,

advertising, or authorizing or benefiting from the provision of services in connection with the Sound Choice Marks.

73.   Defendant FAYE JOHNSON was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

74.   In connection with that show, Defendant FAYE JOHNSON repeatedly displayed the Sound Choice Marks without right or license.

75.   Upon information and belief, Defendant FAYE JOHNSON performs regular karaoke shows in at least two venues in this State using her karaoke system.

76.   Defendant FAYE JOHNSON has advertised or otherwise indicated that she is in possession of a library containing more than 50,000 tracks stored on her karaoke system.

77.   Defendant PARADISE MOON ENTERTAINMENT INC was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

78.   In connection with that show, Defendant PARADISE MOON ENTERTAINMENT INC repeatedly displayed the Sound Choice Marks without right or license.

79.   Upon information and belief, Defendant PARADISE MOON
       ENTERTAINMENT INC performs regular karaoke shows in at least six
       venues in this State using its karaoke system.

80.   Defendant PARADISE MOON ENTERTAINMENT INC has advertised or
       otherwise indicated that it is in possession of a library containing more than
       40,000 karaoke accompaniment tracks.

81.   Upon information and belief, Defendant PARADISE MOON
       ENTERTAINMENT INC operates at least three separate karaoke systems to
       produce karaoke shows at venues in this State.

82.   Upon information and belief, each of Defendant PARADISE MOON
       ENTERTAINMENT INC's karaoke systems includes a library containing
       more than 40,000 accompaniment tracks.

83.   Defendant HI-NOTE ENTERTAINMENT, INC. was observed operating a
       karaoke system to produce a karaoke show at a venue in this State in which
       counterfeit goods bearing the Sound Choice Marks were being used.

84.   In connection with that show, Defendant HI-NOTE ENTERTAINMENT,
       INC. repeatedly displayed the Sound Choice Marks without right or license.

85.   Upon information and belief, Defendant HI-NOTE ENTERTAINMENT,
       INC. performs regular karaoke shows in at least three venues in this State
       using its karaoke system.

86.    Defendant HI-NOTE ENTERTAINMENT, INC. has advertised or otherwise
indicated that it is in possession of a library containing more than 33,000
tracks stored on its karaoke system.

87.    Defendant CHARLES A. MCCONNIEL was observed operating a karaoke
system to produce a karaoke show at a venue in this State in which
counterfeit goods bearing the Sound Choice Marks were being used.

88.    In connection with that show, Defendant CHARLES A. MCCONNIEL
repeatedly displayed the Sound Choice Marks without right or license.

89.    Defendant CHARLES A. MCCONNIEL has advertised or otherwise
indicated that he is in possession of a library containing more than 75,000
karaoke accompaniment tracks.

90.    Upon information and belief, Defendant CHARLES A. MCCONNIEL
operates at least two separate karaoke systems to produce karaoke shows at
venues in this State.

91.    Upon information and belief, each of Defendant CHARLES A.
MCCONNIEL's karaoke systems includes a library containing more than
40,000 accompaniment tracks.

92.    Defendant ROBERT GERHART was observed operating a karaoke system
to produce a karaoke show at a venue in this State in which counterfeit
goods bearing the Sound Choice Marks were being used.

93.   In connection with that show, Defendant ROBERT GERHART repeatedly displayed the Sound Choice Marks without right or license.

94.   Defendant ROBERT GERHART has advertised or otherwise indicated that he is in possession of a library containing more than 55,000 karaoke accompaniment tracks.

95.   Defendant ROBERT GERHART told a Slep-Tone investigator that he had four separate karaoke systems.

96.   Upon information and belief, each of Defendant ROBERT GERHART's karaoke systems includes a library containing more than 55,000 accompaniment tracks.

97.   Defendant TOUCAN ENTERTAINMENT was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

98.   In connection with that show, Defendant TOUCAN ENTERTAINMENT repeatedly displayed the Sound Choice Marks without right or license.

99.   Defendant TOUCAN ENTERTAINMENT has advertised or otherwise indicated that it is in possession of a library containing more than 90,000 karaoke accompaniment tracks.

100.   Upon information and belief, Defendant TOUCAN ENTERTAINMENT, acting through two general partners, Defendants ANDREW COUCHE and

PATRICE COUCHE, operates at least four separate karaoke systems to produce karaoke shows at venues in this State.

101. Upon information and belief, each of Defendant TOUCAN ENTERTAINMENT's karaoke systems includes a library containing more than 90,000 accompaniment tracks.

102. Defendant OUTLAW KARAOKE was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

103. In connection with that show, Defendant OUTLAW KARAOKE repeatedly displayed the Sound Choice Marks without right or license.

104. Defendant OUTLAW KARAOKE has advertised or otherwise indicated that it is in possession of a library containing more than 10,000 karaoke accompaniment tracks.

105. Upon information and belief, Defendant OUTLAW KARAOKE, acting through at least two general partners, Defendants DAVID NOTHSTINE and ELIZABETH NOTHSTINE, operates at least three separate karaoke systems to produce karaoke shows at venues in this State.

106. Upon information and belief, each of Defendant OUTLAW KARAOKE's karaoke systems includes a library containing more than 10,000 accompaniment tracks.

107.   Defendant MOBILE MUSIC EXPRESS LLC was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

108.   In connection with that show, Defendant MOBILE MUSIC EXPRESS LLC repeatedly displayed the Sound Choice Marks without right or license.

109.   Defendant MOBILE MUSIC EXPRESS LLC has advertised or otherwise indicated that it is in possession of a library containing more than 37,000 karaoke accompaniment tracks.

110.   Defendant MOBILE MUSIC EXPRESS LLC regularly performs karaoke shows in three separate venues simultaneously.

111.   Defendant MOBILE MUSIC EXPRESS LLC operates at least three separate karaoke systems to produce karaoke shows at venues in this State.

112.   Upon information and belief, each of Defendant MOBILE MUSIC EXPRESS LLC's karaoke systems includes a library containing more than 37,000 accompaniment tracks.

113.   Defendant STEVE JARVIS was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

114.   In connection with that show, Defendant STEVE JARVIS repeatedly displayed the Sound Choice Marks without right or license.

115.   Defendant STEVE JARVIS regularly performs karaoke shows in at least
       four separate venues simultaneously.

116.   Defendant STEVE JARVIS operates at least four separate karaoke systems
       to produce karaoke shows at venues in this State.

117.   Defendant D & D'S PUB, INC. and/or Defendant DANIEL BRANCH was
       observed operating, through an employee or contractor known as DJ Chuck,
       a karaoke system to produce a karaoke show at the D & D's Pub
       establishment in which counterfeit goods bearing the Sound Choice Marks
       were being used.

118.   Upon information and belief, the karaoke system described in the preceding
       paragraph is directly owned by Defendant D & D'S PUB, INC. and/or by
       Defendant DANIEL BRANCH.

119.   In connection with that show, DJ Chuck repeatedly displayed the Sound
       Choice Marks without right or license.

120.   Defendant DANIEL BRANCH performs regular weekly karaoke shows at D
       & D's Pub in addition to regular karaoke shows he performs at other venues
       in this state.

121.   Defendant DANIEL BRANCH has advertised or otherwise indicated that he
       is in possession of a library containing more than 12,000 tracks stored on his
       karaoke system.

122.   Upon information and belief, Defendant DANIEL BRANCH and Defendant D & D'S PUB, INC. have duplicate copies of the same burned discs on each of their systems.

123.   Upon information and belief, Defendant D & D'S PUB, INC. is in possession of a library containing more than 12,000 tracks stored on its karaoke system.

124.   Defendant MAROG ENTERTAINMENT was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

125.   In connection with that show, Defendant MAROG ENTERTAINMENT repeatedly displayed the Sound Choice Marks without right or license.

126.   Defendant MAROG ENTERTAINMENT has advertised or otherwise indicated that it is in possession of a library containing more than 48,000 tracks stored on its karaoke system.

127.   Defendant CHRIS CONRAD was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

128.   In connection with that show, Defendant CHRIS CONRAD repeatedly displayed the Sound Choice Marks without right or license.

129.   Defendant CHRIS CONRAD has advertised or otherwise indicated that he is in possession of a library containing more than 45,000 tracks stored on his karaoke system.

130.   Defendant BRENDA BREININGER was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

131.   In connection with that show, Defendant BRENDA BREININGER repeatedly displayed the Sound Choice Marks without right or license.

132.   Defendant BRENDA BREININGER has advertised or otherwise indicated that she is in possession of a library containing more than 90,000 tracks stored on her karaoke system.

133.   Defendant MICHAEL ANGELO MINCIELI was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

134.   In connection with that show, Defendant MICHAEL ANGELO MINCIELI repeatedly displayed the Sound Choice Marks without right or license.

135.   Defendant MICHAEL ANGELO MINCIELI has advertised or otherwise indicated that he is in possession of a library containing more than 150,000 karaoke accompaniment tracks.

136.   Defendant MICHAEL ANGELO MINCIELI regularly performs karaoke shows in at least three separate venues simultaneously.

137.   Defendant MICHAEL ANGELO MINCIELI operates at least three separate karaoke systems to produce karaoke shows at venues in this State.

138.   Upon information and belief, each of Defendant MICHAEL ANGELO MINCIELI's karaoke systems includes a library containing more than 150,000 accompaniment tracks.

139.   Defendant MARK FLEMING was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

140.   In connection with that show, Defendant MARK FLEMING repeatedly displayed the Sound Choice Marks without right or license.

141.   Defendant MARK FLEMING has advertised or otherwise indicated that he is in possession of a library containing more than 29,000 tracks stored on his karaoke system.

142.   Defendant SEAN COREY ENTERTAINMENT, LLC was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

143. In connection with that show, Defendant SEAN COREY ENTERTAINMENT, LLC repeatedly displayed the Sound Choice Marks without right or license.

144. Upon information and belief, Defendant SEAN COREY ENTERTAINMENT, LLC maintains a library containing more than 100,000 tracks stored on its karaoke system.

145. Defendant ISLAND ENTERTAINMENT, LLC was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

146. In connection with that show, Defendant ISLAND ENTERTAINMENT, LLC repeatedly displayed the Sound Choice Marks without right or license.

147. Defendant ISLAND ENTERTAINMENT, LLC has advertised or otherwise indicated that it is in possession of a library containing more than 19,000 karaoke accompaniment tracks.

148. Defendant ISLAND ENTERTAINMENT, LLC regularly performs karaoke shows in at least three separate venues simultaneously.

149. Defendant ISLAND ENTERTAINMENT, LLC operates at least three separate karaoke systems to produce karaoke shows at venues in this State.

150. Upon information and belief, each of Defendant ISLAND ENTERTAINMENT, LLC's karaoke systems includes a library containing more than 19,000 accompaniment tracks.

151. Defendant DEANA JENNINGS was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

152. In connection with that show, Defendant DEANA JENNINGS repeatedly displayed the Sound Choice Marks without right or license.

153. Defendant DEANA JENNINGS has advertised or otherwise indicated that she is in possession of a library containing more than 69,000 karaoke accompaniment tracks.

154. Defendant DEANA JENNINGS regularly performs karaoke shows in at least two separate venues simultaneously.

155. Defendant DEANA JENNINGS operates at least two separate karaoke systems to produce karaoke shows at venues in this State.

156. Upon information and belief, each of DEANA JENNINGS's karaoke systems includes a library containing more than 69,000 accompaniment tracks.

157.   Defendant MICHELE BROWNING was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

158.   In connection with that show, Defendant MICHELE BROWNING repeatedly displayed the Sound Choice Marks without right or license.

159.   Defendant MICHELE BROWNING has advertised or otherwise indicated that she is in possession of a library containing more than 60,000 tracks stored on her karaoke system.

160.   Defendant JAMES ALLEN was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

161.   In connection with that show, Defendant JAMES ALLEN repeatedly displayed the Sound Choice Marks without right or license.

162.   Defendant JAMES ALLEN has advertised or otherwise indicated that he is in possession of a library containing more than 80,000 tracks stored on his karaoke system.

163.   Defendant REUBEN JENKINS was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

164.  In connection with that show, Defendant REUBEN JENKINS repeatedly displayed the Sound Choice Marks without right or license.

165.  Defendant REUBEN JENKINS has advertised or otherwise indicated that he is in possession of a library containing more than 20,000 tracks stored on his karaoke system.

166.  Defendant NICHOLAS SILEO was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

167.  In connection with that show, Defendant NICHOLAS SILEO repeatedly displayed the Sound Choice Marks without right or license.

168.  Defendant NICHOLAS SILEO has advertised or otherwise indicated that he is in possession of a library containing more than 500,000 songs stored on his system, of which a substantial portion are karaoke tracks.

169.  Defendant NICHOLAS SILEO is not possession of a lawful original disc for each karaoke track stored on his system.

170.  Defendant SPOTLIGHT ENTERTAINMENT was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

171.  In connection with that show, Defendant SPOTLIGHT ENTERTAINMENT repeatedly displayed the Sound Choice Marks without right or license.

172. Defendant SPOTLIGHT ENTERTAINMENT has advertised or otherwise indicated that it is in possession of a library containing more than 44,000 tracks stored on its karaoke system.

173. Defendant SUSAN BADGLEY was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

174. In connection with that show, Defendant SUSAN BADGLEY repeatedly displayed the Sound Choice Marks without right or license.

175. Defendant SUSAN BADGLEY has advertised or otherwise indicated that she is in possession of a library containing more than 100,000 tracks stored on her karaoke system.

176. Defendant MONA LISA was observed operating, through an employee or contractor known as "DJ Rose" a karaoke system to produce a karaoke show at its establishment in which counterfeit goods bearing the Sound Choice Marks were being used.

177. Upon information and belief, the karaoke system described in the preceding paragraph is directly owned by Defendant MONA LISA.

178. In connection with that show, Defendant MONA LISA repeatedly displayed the Sound Choice Marks without right or license.

179. Defendant MONA LISA has advertised or otherwise indicated that it is in possession of a library containing more than 70,000 tracks stored on its karaoke system.

180. Defendant JIM & SUSIE'S KARAOKE was observed operating a karaoke system to produce a karaoke show at a venue in this State in which counterfeit goods bearing the Sound Choice Marks were being used.

181. In connection with that show, Defendant JIM & SUSIE'S KARAOKE repeatedly displayed the Sound Choice Marks without right or license.

182. Defendant JIM & SUSIE'S KARAOKE has advertised or otherwise indicated that it is in possession of a library containing more than 120,000 tracks stored on its karaoke system.

183. Based upon the popularity of SLEP-TONE's music and the size of the Defendants' respective libraries, which vary between 10,000 and 150,000 karaoke accompaniment tracks, operating in many cases with multiple karaoke systems, the Plaintiff has a good-faith belief that discovery will show that each of the Defendants who operates a karaoke system for his, her, or its own account is in possession of unauthorized counterfeit goods bearing the Sound Choice Marks.

184. Each of the Defendants is accused of committing acts of infringement, unfair competition, and deceptive and unfair trade practices in substantially the

same way, namely, through the use of counterfeit karaoke tracks to perform

karaoke-related services.

185.   Though created through unauthorized duplication, the counterfeit karaoke

tracks obtained or made by the Defendants all originated, directly or

indirectly in an unbroken sequence, from the same ultimate source, namely,

from compact discs sold by the Plaintiff and made from master recordings

belonging to the Plaintiff.

186.   As such, the Plaintiff's right to relief, as stated in the paragraphs below,

ultimately arises out of the same series of transactions and occurrences.

187.   This action raises substantial questions of law and fact common to all of the

defendants hereto.

## FIRST CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT

188.   Plaintiff SLEP-TONE realleges each and every allegation set forth in the

foregoing paragraphs, as though fully set forth herein, and incorporates them

herein by reference.

189.   Each of the Defendants used, or authorized or directly benefited from the use

of, a reproduction, counterfeit, or copy of the Sound Choice Marks in

connection with the provision of services including karaoke services, by

manufacturing or acquiring the reproduction, counterfeit, or copy of the

Sound Choice Marks and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

190. The Defendants' use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

191. Plaintiff SLEP-TONE did not license any of the Defendants to manufacture or acquire reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection with the provision of their services.

192. The Defendants' use of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive the Defendants' customers and patrons into believing that the Defendants' services are being provided with the authorization of the Plaintiff and that the Defendants music libraries contain bona fide Sound Choice accompaniment tracks.

193. The acts of each of the Defendants were willful.

194. Unless enjoined by the Court, the Defendants' infringing activities as described above will continue unabated and will continue to cause harm to the Plaintiff.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

195. Plaintiff SLEP-TONE realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

38

196. On each occasion when they caused a SLEP-TONE accompaniment track to be played during a karaoke show, the Defendants displayed the Sound Choice Marks in connection with the Defendants' karaoke services.

197. The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that SLEP-TONE sponsored or approved the Defendants' services and commercial activities.

198. The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by SLEP-TONE and purchased by the Defendants.

199. The Defendants' use of the Sound Choice Marks in this fashion would have inured to the benefit of the Plaintiff if the Defendants had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that the Plaintiff would have received revenue from such sales.

200. Because SLEP-TONE has been denied this revenue, it has been damaged by the Defendants' uses.

201.  Unless enjoined by the Court, the Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to the Plaintiff.

## THIRD CLAIM FOR RELIEF
## DECEPTIVE AND UNFAIR TRADE PRACTICES
## UNDER FLA. STAT. § 501.211

202.  Plaintiff SLEP-TONE realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

203.  Each Defendant has engaged in acts of infringement of the Sound Choice Marks, in derogation of SLEP-TONE's common-law and statutory rights in those marks.

204.  Each Defendant's acts of infringement occurred during the conduct of trade or commerce.

205.  Each Defendant's acts of infringement constitute deceptive or unfair trade practices within the meaning of Fla. Stat. § 501.204(1) (2009).

206.  As a direct and proximate result of each Defendant's acts of infringement, SLEP-TONE has suffered a pecuniary loss, to wit:  the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which

revenue would have been received but for the Defendants' acts in creating or

acquiring counterfeits of SLEP-TONE's accompaniment tracks.

207.   As such, SLEP-TONE is an aggrieved person within the meaning of Fla.

Stat. § 501.211(1) (2009).


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SLEP-TONE prays for judgment against each of the

Defendants severally and that the Court:

A.   Find that each of the Defendants has committed acts of infringement,

including but not limited to counterfeiting, of the federally registered Sound

Choice Marks;

B.   Find that each of the Defendants has engaged in unfair competition against

Plaintiff SLEP-TONE in violation of 15 U.S.C. § 1125(a);

C.   Find that each of the Defendants has committed deceptive and unfair trade

practices under Florida law;

D.   Enter judgment against each of the Defendants and in favor of SLEP-TONE;

E.   Find the that Defendants' activities were in all respects conducted willfully

and for profit;

F.   Award to SLEP-TONE the Defendants' profits and the damages sustained

by SLEP-TONE because of the Defendants' conduct in infringing the Sound

Choice Marks, or, in the alternative, statutory damages per trademark infringed by counterfeiting;

G.    Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a);

H.    Award to SLEP-TONE treble, punitive, or otherwise enhanced damages, as available, for the Defendants' acts of willful infringement;

I.    Award to SLEP-TONE its actual damages caused by the Defendants' deceptive and unfair trade practices, plus its attorney's fees and court costs as provided in Fla. Stat. § 501.2105 (2009).

J.    Order the seizure of all computer disks, drives, or other media belonging to any of the Defendants, which media contain illegal counterfeits of registered trademarks;

K.    Grant SLEP-TONE preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by the Defendants;

L.    Award SLEP-TONE its costs of suit and attorney's fees, to the extent not awarded above; and

M.    Grant SLEP-TONE such other and further relief as justice may require.

Respectfully submitted this the 2nd day of February, 2011.

**HARRINGTON LAW, P.C.**


By:      s/James M. Harrington
James M. Harrington, N.C. State Bar No. 30005
jharrington@harringtonlawpc.com
Maria D. Floren, N.C. State Bar No. 41236
mfloren@harringtonlawpc.com
*Attorneys for the Plaintiff*

HARRINGTON LAW, P.C.
PO Box 403
Concord, North Carolina 28026-0403
Telephone:  704-315-5800
Facsimile:  704-625-9259