## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

| | |
|---|---|
| In re SLEP-TONE ENTERTAINMENT CORP., consolidated cases. | **Civil Action No. 5:11-cv-00032-RS/CJK** |

### PLAINTIFF'S TRIAL BRIEF

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its counsel, in aid of the Court in its trial of the above-captioned matter concluded on July 3, 2012, hereby submits a trial brief and memorandum of points and authorities, to be read in conjunction with the Plaintiff's Proposed Findings of Fact and Conclusions of Law, submitted simultaneously herewith.

## I.     Introduction

This is an action for trademark infringement, federal unfair competition, and state-law deceptive and unfair trade practices, in which the Defendants, Donovan's Reef Lounge and Package Store, Inc. ("Donovan's Reef"), Green Glass Mall, Inc. ("GGM"), and Robert L. Paynter, Sr. ("Paynter") stand accused of having infringed Slep-Tone's federally registered SOUND CHOICE trademarks by using unauthorized duplicates of karaoke accompaniment tracks that bear the SOUND CHOICE trademarks to provide karaoke entertainment to their customers and patrons.

1

The statutes at issue in this matter are concerned with three goals that represent policy choices by the Congress and, as to the state-law claim, by the Florida legislature, in regulating information conveyed to the marketplace about the goods and services offered there.  Those goals are to protect the public from being misled about the nature and source of goods and services, to protect the rights of a business to identify itself to the public and its reputation in offering goods and services to the public, and to promote and protect the public interest in fair competition in the marketplace.

## II.    Elements of Trademark Infringement

In order to prove up a claim for trademark infringement, a plaintiff must show, by the preponderance of evidence, that the asserted trademarks are valid and protectable, that the plaintiff owns the asserted trademarks, and that the mark used by the defendant was used in commerce without the plaintiff's consent, in a manner that is likely to cause confusion in the consuming public as to the source, sponsorship, affiliation, or approval of the goods or services.  *See, e.g., McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998).

The validity and ownership of the SOUND CHOICE Marks is uncontested in this matter.  Consequently, the establishment of a prima facie case of trademark infringement depends necessarily upon the likelihood of confusion analysis.

In the courts of the Eleventh Circuit, likelihood of confusion is assessed through the application of a seven-factor test that analyzes:

(1) the distinctiveness of the mark alleged to have been infringed;

(2) the similarity of the infringed and infringing marks;

(3) similarity between the goods or services offered under the two marks;

(4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base;

(5) similarity of advertising methods;

(6) intent of the alleged infringer to misappropriate the proprietor's good will; and

(7) existence and extent of actual confusion in the consuming public.

*See Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir.1986), *cert. denied*, 481 U.S. 1041 (1987).  A court must analyze all seven factors in assessing whether there is a likelihood of confusion, so as to make a judgment with respect to the likelihood of confusion under the totality of the circumstances. *See Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488-89 (11th Cir. 1987).  However, not all seven factors have equal weight, and likelihood of confusion analysis is not numerical as to the factors.  *See Welding Servs. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007).  The court must also evaluate the

weight to be assigned to the factors as part of the analysis.  *See Ambrit*, 812 F.2d at 1538.

In the instant case, these factors, viewed in light of the evidence of record, reflect that there is indeed a likelihood of confusion among the consumers of the Defendants' goods and services as to the source, sponsorship, affiliation, or approval of those goods and services.

**Distinctiveness of the SOUND CHOICE Marks.**  The SOUND CHOICE Marks have been in use for more than 25 years and have been federally registered for more than 15 years.  (Plaintiff's Exhibit ("PE") #1-#4.)  The registrations were issued without any requirement for proof of secondary meaning, as evidenced by a lack of a "§ 2(f) designation" on their face.  *See id.*; 15 U.S.C. § 1052(f).  The trademarks are strong and inherently distinctive, and they are attached to goods of a company recognized as the industry's quality leader that once boasted a 50% share of the commercial market and that today is typically the brand chosen between 60% and 100% of the time by karaoke jockeys during shows. (Trial Transcript ("T.") 59:2-11.)  The Defendants have presented no evidence on this point.  This factor strongly favors a finding of a likelihood of confusion.

**Similarity of the infringed and infringing marks.**  The marks used by the Defendants are not merely similar to the SOUND CHOICE Marks.  Those marks are, for all intents and purposes, identical to the SOUND CHOICE Marks, in that

they were copied, directly or indirectly, from the actual marks.  This factor also strongly favors a finding of a likelihood of confusion.

**Similarity between the goods or services offered under the two marks.** Slep-Tone offers compact discs and its karaoke accompaniment tracks under the two marks.  While the Defendants undoubtedly offer other goods and services— Donovan's Reef and GGM offer beverages, while Paynter provides entertainment services that do not involve karaoke—what is critical for this analysis is a determination as to what, exactly, the Defendants have attached the SOUND CHOICE Marks.  The Defendants have attached the SOUND CHOICE Marks to the karaoke accompaniment tracks stored on their computer hard drives.  A substantial part of their activity with respect to the SOUND CHOICE Marks rests in the granting of access to those karaoke accompaniment tracks to patrons; that is the "use" of the mark.  For that reason, it would be unreasonable to conclude that the Defendants' goods—at least those of importance to the trademark use—are karaoke accompaniment tracks, which are of exactly the same class of goods as those offered by Slep-Tone under the SOUND CHOICE Marks.  Accordingly, this factor again weighs heavily in favor of a finding of a likelihood of confusion.

**Similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base.**  Slep-Tone's sales methods include distributing karaoke accompaniment tracks on compact discs to persons who use

5

those tracks to provide commercial karaoke services; those methods are necessarily focused on distribution of goods.  By contrast, the Defendants tend to sell karaoke, or to give it away as a sales incentive, as a service.  There is no escaping that these are different approaches.  Nevertheless, as may be even more important than the particular method of sales of the product, the target market—the aficionados of karaoke, so to speak—for each of the parties does overlap.  Slep-Tone does sell its products to so-called "home users"—people who do not make commercial use of their karaoke discs, but simply want to play karaoke music or practice their singing at home.  Common sense dictates that those persons who enjoy karaoke enough to purchase their own discs for use at home are also likely to patronize establishments that offer public karaoke.  Moreover, George Davis, the principal of Donovan's Reef and GGM, testified to the existence of a side business he had in selling karaoke discs to patrons, which directly evidences an overlap in the customer base.

Thus, this factor weighs in favor of a finding of a likelihood of confusion, although with less power than the first three factors.

**Similarity of advertising methods.**  Neither party introduced evidence concerning the advertising methods used by any of the parties; this factor must therefore be neutral on the question of likelihood of confusion analysis, favoring neither Slep-Tone nor the Defendants.

**Intent of the alleged infringer to misappropriate the proprietor's good will.**  While there was little evidence made of record with respect to the Defendants' intent to misappropriate Slep-Tone's business good will, the evidence that was made of record weighs in favor of a finding of a likelihood of confusion, at least as to Donovan's Reef and GGM.  Those two defendants used copies of karaoke tracks from at least 80 compact discs that they did not possess at all and were unable to present any evidence that they had ever owned.  (PE #6, p. 12.) Even if they believed that they had the right to make multiple copies of the discs they owned and possessed, they could not possibly have legitimately believed that they could legally use copies of discs they did not own.  Accordingly, the most reasonable inference to be drawn from those Defendants' use of material from discs they did not own is an intent to misappropriate the good will associated with the high quality karaoke tracks that Slep-Tone produces.  This factor favors a finding of a likelihood of confusion.

**Existence and extent of actual confusion in the consuming public.**  The parties also put on no substantive evidence regarding the existence and extent of actual confusion in the consuming public, but the Defendants testified that they were unaware of any confusion on the part of their customers and patrons; this factor therefore weighs weakly against a finding of likelihood of confusion.

As to the weight of the various factors, the character of the Defendants' use of the SOUND CHOICE Marks should cause the Court to afford great weight to the first three factors.  The Defendants have used <u>counterfeit</u> marks—as will be discussed *infra*—and that necessarily implies the identical reproduction of the SOUND CHOICE Marks on virtually identical goods.  Such uses raise a strong presumption of a likelihood of confusion, as well as intent to cause confusion.  *See Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1252, 1262 (S.D. Fla. 2002); *Polo Fashions v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) (affirming summary judgment for the plaintiff while stating that "the likelihood of confusion was so unassailably established" where the defendant sold shirts bearing a logo "substantially identical" to the plaintiff's mark).

## III.    Counterfeiting

All of the Defendants have owned SOUND CHOICE-branded karaoke discs for many years.  (T. 159:21-24, 170:5-7, 181:21-25.) Two features of the discs themselves provided notice to the Defendants that unauthorized reproduction of the discs was prohibited at all relevant times: the ® symbol, meaning a federally registered trademark, which appears next to the mark on those discs; and a legend that warns against the unauthorized reproduction and public performance of the contents of the discs, placed on the disc at the behest of underlying rights holders.

Donovan's Reef, GGM, and Paynter therefore knew—actually and constructively—at the time of the creation of the karaoke accompaniment tracks stored on their systems that they were making unauthorized copies of Slep-Tone's tracks, and they knew that those copies were marked with the SOUND CHOICE Marks because those marks appeared when the tracks were played.

As a matter of law, for purposes of trademark law, each Defendant is the origin of the karaoke accompaniment tracks stored on their hard drives.  *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) (unanimous) ("In sum, reading the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were not designed to protect originality or creativity), and in light of the copyright and patent laws (which were), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods"). Therefore, the placement of the SOUND CHOICE Marks upon those tracks, which was undertaken during the ripping process, constitutes the intentional application of a spurious designation— not merely a false designation of origin, but in fact counterfeiting within the meaning of the Trademark Act.  *See* 15 U.S.C. §§ 1116(d)(1)(B), 1127 ("A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark").

**IV.  The Defendants' Affirmative Defenses and Avoidances**

The Defendants have, in bits and pieces, sought to articulate various defenses and explanations for their conduct, which presumably they hope the Court will find to excuse their misconduct in whole or in part.  It bears repeating that none of the Defendants stated even a single affirmative defense in their pleadings, nor have any of the Defendants sought to amend their pleadings to conform to evidence they submitted as part of their defense.  Accordingly, those defenses should be considered waived.  *See* Fed. R. Civ. P. 9(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense").

Notwithstanding any waiver, however, none of the defenses or explanations the Defendants have tried to establish serve to mitigate their misconduct under any reasonable reading of the Trademark Act and applicable case law.

**Lack of Notice of Media-Shifting Policy.**  Among the Defendants' first contentions is that they received no notice of Slep-Tone's Media-Shifting Policy ("MSP") and should therefore not be held to that policy.  The MSP is not a contract requiring the Defendants' knowledge or consent for it to be effective.  Rather, the MSP is a policy statement governing the manner in which Slep-Tone will consent to the media-shifting of its karaoke tracks.  The Defendants' position appears to be that because they had no notice of conditions Slep-Tone places upon its consent to media-shifting, the Defendants were entitled to media-shift under any

10

configuration they choose.  This approach is wrong-headed.  If the Defendants did

not consent to the MSP—either because they rejected it outright or because they

did not know about it—their conduct must be judged under the default position, as

though no MSP existed.

That default position is:  "**Don't Copy**."  That is the position stated on the

discs; it is the position embodied in the Trademark Act.  The MSP is a loosening of

that basic restriction, and it is the only loosening of that basic restriction that is

potentially applicable to this case.  If the Defendants do not want to be judged on

the basis of their compliance or non-compliance with the MSP, they are welcome

to be judged on the much harsher basis of their compliance or non-compliance with

the default policy.  Under the default policy, all of their media-shifting is

unauthorized.[1]

In a related vein, the Defendants contend that their media-shifting was

merely an attempt to advance toward new technology, and that they should not be

penalized for seeking to use that technology.  While it is true that computer

systems are a more convenient mechanism for storing, transporting, and using

karaoke accompaniment tracks, that mechanism nevertheless requires the making

of an unauthorized copy of the karaoke accompaniment tracks—and, at least as to

---

[1] Of course, because the Defendants did not comply with the MSP, all of their media-shifting
was unauthorized anyway.  The point is that discounting the existence of the MSP does not
improve their position.

Donovan's Reef and GGM, and possibly as to Paynter, enabled them to make simultaneous use of more copies of those tracks than they had paid for. This is not the same as a personal user placing copies of a music track on the person's iPhone, iPod, iPad, and computer; an individual user is not making money from those copies and is unlikely to use more than one copy of that track at the same time. By contrast, the copying of karaoke accompaniment tracks to multiple hard drives enables the same track to be offered as part of a profit-making enterprise at multiple disparate locations at the same time—something that could never have been done with a single original disc.

**Fair Use.** In the trademark context, there are two types of fair use: "classic" or descriptive fair use and nominative fair use.

In descriptive fair use the defendant utilizes plaintiff's mark not to identify plaintiff's product, but merely to describe his own. *See, e.g.*, 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §23:11 (4th ed.). Classic fair use requires that the defendant have used the mark in its descriptive sense, rather than as a trademark; that the defendant have used the mark fairly and in good faith; and that the defendant have used the mark only to describe the defendant's own goods or services. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002). Classic fair use of the SOUND CHOICE Marks is conclusively ruled out by the

12

inherently and highly distinctive nature of the Marks—essentially, there are no descriptive uses of the Marks.

Nominative fair use requires a defendant to show that: (1) the plaintiff's mark is necessary to identify plaintiff's product; (2) in doing so defendant does not use more of plaintiff's mark than necessary; and (3) "defendant's conduct or language reflect[s] the true and accurate relationship between plaintiff and defendant's products or services." *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 232 (3d Cir. 2005); *see also New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

Here, the Defendants are not using the SOUND CHOICE Marks to identify Slep-Tone's goods; they are using the marks to identify the Defendants' own goods.  But even to the extent that they are seeking to identify Slep-Tone as the original recording studio of the tracks—something they have not actually asserted—they still fail the second prong, because they are using more of the mark than is reasonably necessary to identify the goods.  The Defendants could produce the mark onscreen by playing their original discs in order to accomplish that purpose; it is not necessary that they make copies of the mark in order to do that.

For the foregoing reasons, the Defendants' fair use defenses must fail.

**Lack of Competition with Slep-Tone.**  The Defendants contend that because they do not compete directly with Slep-Tone, there can be no consumer

harm associated with their use of unauthorized copies of the marks and no unfair competition.

It is true that the Defendants do not compete directly with Slep-Tone. However, whether the parties are in direct competition is not particularly meaningful for an analysis of the Defendants' competitive activities. It is axiomatic that the Defendants are in competition with others to provide the same services to the same prospective consumers of those services. To the extent that they are infringing upon Slep-Tone's trademark rights, they are competing unfairly with the Defendants' direct competitors, who are bound by the same laws and subject to the same policies that the Defendants have chosen to ignore. The result of their unfair competition is that Slep-Tone has been damaged—not only because of losses attributable to the Defendants' misconduct, but also because their misconduct incentivizes their competitors also to engage in misconduct of the same character. The Trademark Act and FDUTPA do not require that the parties be in direct competition with each other for a trademark owner's claims to be actionable.

**Copyright Pre-emption**. Donovan's Reef and GGM have contended that this action should have been brought as a copyright action. This argument is tantamount to an argument that the Copyright Act has pre-empted the Trademark Act. The argument, however, does not square with the Supreme Court's central

holding in *Dastar Corp.*, which, reading the two acts together, concludes that they are separately applicable to different kinds of conduct.

**Prior purchases.** Donovan's Reef and GGM contend that, whatever their current holdings of discs may be, they previously owned a sufficient number of copies of every disc, the contents of which they have used and copied, to demonstrate one-to-one correspondence between their computer systems and their karaoke systems. They also contend that it is unfair for them to be required to maintain possession of all of their karaoke discs over the many years they have owned them, in order to maintain copies of the contents of those discs on their computer systems.

Donovan's Reef and GGM have produced not one shred of documentary evidence indicating that they ever owned a single disc that they do not currently possess. All of the receipts they produced were for discs they already possessed. It is possible, of course, that they previously owned many SOUND CHOICE-branded discs that were stolen, lost, or damaged and discarded. But the only indication in evidence that this is actually the case is the self-serving testimony of George Davis. Even if that testimony were enough to establish that the purchases had been made, as will be discussed *infra*, Mr. Davis's testimony regarding his compliance with one-to-one correspondence should be discounted entirely, either

because of his lack of candor on the stand or because of his having hidden evidence in discovery.

Slep-Tone's MSP requires that the system owner own and maintain possession of the original discs.  If all that were required to defeat that policy, for example upon some "equitable" ground, was the system owner's testimony about prior purchase, or even receipts showing prior purchase, then any system owner who wished to cheat the system would be able to do so by purchasing discs, making the copies, and selling off the original discs—or, perhaps, skipping the step of purchasing the discs entirely.  Testimony about prior ownership of discs cannot form the basis of a defense in this action.

## V.      Unfair Competition and FDUTPA

The existence of the likelihood of confusion establishes the Defendants' liability not only for trademark infringement as discussed above, but also for false designation of origin. *See John H. Harland Co. v. Clarke Checks, Inc*., 711 F.2d 966, 981 (11th Cir. 1983) (elements of a claim for trademark infringement and for federal unfair competition are the same).

Likewise, acts of trademark infringement are unfair and deceptive trade practices.  *See TracFone Wireless, Inc. v. Access Telecom, Inc.*, 642 F. Supp. 2d

1354, 1365 (S.D. Fla. 2009) ("Engaging in trademark infringement is an unfair and deceptive trade practice that violates" FDUTPA).

## VI.     Spoliation and intentional infringement

Paynter has admitted in documents filed with the Court that he destroyed evidence by deleting tracks from his hard drive, despite an express warning from the Plaintiff against doing so.[2]

As to Donovan's Reef and GGM, several factors indicate that they have destroyed or hidden evidence, including: (1) the sudden need to create all-new hard drives shortly before the trial of this matter, (2) a long period of delay in responding to the Plaintiff's discovery requests, coupled with a late refusal to produce their karaoke drives for examination in response to those discovery requests, (3) the necessity of compelling that disclosure, (4) the failure to provide appropriate power supplies for the so-called "crashed" drives during the inspection, and (5) the structural inconsistency between Mr. Davis's testimony with respect to the creation of the new karaoke drives, the possible sources of tracks stored on those drives, and the output of the Donovan's Reef computer system.

---

[2] As Mr. Slep testified, it would theoretically have been possible, two years after the deletion of the tracks, to recover them forensically.  The decision not to do so, undertaken in light of Mr. Paynter's admission that he destroyed the tracks, and given the short timetable available to the Plaintiff for discovery of Mr. Paynter's system and the expense of undertaking a forensic recovery and analysis of the tracks, was reasonable under the circumstances.

As to the last point, the "new" drives—the small red drives that Mr. Slep testified about inspecting—were, by Mr. Davis's testimony, created in April or May 2012.  Mr. Davis also testified that those drives were copied from an older drive that was one of only two older drives in use by the two venues.  Mr. Davis further testified that the two older drives crashed within three days of each other, and that the initial new drive was created between those two dates.

Mr. Slep testified, however, that the Donovan's Reef copy of CompuHost reported tracks that were (a) not available to be played from the hard drive that was attached, but (b) had been played from some hard drive that had been attached as recently as June 9, 2012. Mr. Slep also testified that a scan of the hard drive did not reveal any deleted tracks.

Even if the first hard drive had crashed on May 31, that would mean that the second hard drive crashed on June 3.  The Defendants stipulated that all three of the new drives were identical with respect to Slep-Tone content.  If both of the older drives were crashed by June 3, and the newer drives all had the same content, CompuHost could not possibly report music played from a "different" hard drive— different because the tracks played were not on the new drive—unless (a) the older drives were not in fact "crashed" (and any testimony to the contrary was false), or (b) Donovan's Reef and GGM are in possession of a drive they failed to disclose for inspection despite a court order to do so.

18

Under either scenario, Donovan's Reef and GGM have hidden evidence from the Plaintiff and from the Court.  The Plaintiff is entitled to a presumption that the evidence would have reflected negatively upon the Defendants' position. While it is entirely speculative as to what exactly has been hidden, the reasons for doing so are not:  The Defendants were hiding incriminating evidence.  That simple fact, loath as the Plaintiff is to levy it as a charge, must guide the Court in its deliberations as to the Defendants' liability and the appropriate measure of damages.  Certainly it would be a sufficient basis for a finding that the Defendants' infringement was willful and intentional.

## VII.  Damages

For trademark infringement and unfair competition, the Trademark Act provides that:

> the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 U.S.C. §§ 1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may

> in its discretion enter judgment for such sum as the court shall
> find to be just, according to the circumstances of the case. Such
> sum in either of the above circumstances shall constitute
> compensation and not a penalty.

15 U.S.C. § 1117(a).

Here, as to Donovan's Reef and GGM, Slep-Tone proposes that the damages it has sustained amount to $9,585.00.  This figure is the amount that would have inured to Slep-Tone if Donovan's Reef and GGM had purchased a sufficient number of original discs to match their computer systems—a total of 426 discs, at 15 tracks per disc and $1.50 wholesale cost per track.  While Slep-Tone would have likely incurred some expenses associated with producing those discs, that figure does not include any amount of damages for injury to Slep-Tone's reputation, to the loss of business goodwill, or for damage to Slep-Tone as a going concern.

Slep-Tone cannot say with certainty that it has sustained financial damage due to Paynter's conduct, and as such does not contend that any figure is appropriate for its actual damages.

Slep-Tone is also entitled to the disgorgement of the Defendants' profits attributable to karaoke.  Slep-Tone proposes that as to Paynter, a year's revenue, $10,400 (calculated at $200 per week, 52 weeks per year) is an appropriate figure for Paynter's gross sales. As to Donovan's Reef and GGM, their sales between

2007 and 2011 are documented in Plaintiff's Exhibits 8, 9, and 10 in the hand of their co-owner, a certified public accountant.  Those sales figures constitute revenues produced during "karaoke hours" at the two locations.

During the Plaintiff's summation, the Court expressed doubt as to whether the revenues produced during karaoke hours at the two locations are fairly attributable to karaoke.  It should be noted that the Defendants themselves contend that karaoke hours produce more revenue than non-karaoke hours.  While it is possible that some persons who do not enjoy karaoke will go elsewhere during karaoke hours, there is no evidence of record supporting that theory. What is of record is the Defendants' own statements regarding the revenues they earn during karaoke hours, and it is unlikely that the Defendants would continue to feature karaoke entertainment if doing so were not profitable.  At least some of the revenues earned during that time are attributable to karaoke.

More importantly, however, the Trademark Act places the burden on the Defendants to show any costs or deductions—such as, for example, by proving a deduction for a "baseline" revenue associated with non-karaoke hours, or by proving their actual expenses of operation.  The Defendants elected not to put on any such evidence.  (The same is true for Paynter, who put on no evidence of his costs.)  As such, the entire amount of gross revenue, per statute, must be assessed as the Defendants' profits for purposes of establishing actual damages.  While it is

21

within the Court's purview to reduce or augment that award if the award is excessive or insufficient—and indeed, some reduction may be appropriate—the starting point must necessarily be the figure as calculated under the statute.

It is equally important, when assessing the fairness of that award, that the Defendants had ample time and opportunity to present evidence of their expenses and made the conscious choice not to do so.  As such, to provide a discount from the calculated award based upon what their expenses "must have been" would be necessarily arbitrary, without any basis in the record, and contrary to the choice of Congress to put the burden of proof of expenses on the Defendants.

If the Court determines that the Defendants' conduct amounted to intentional trademark infringement involving counterfeiting, the Court "shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater."  15 U.S.C. § 1117(b).

The Plaintiff is also entitled to injunctive relief against infringement pursuant to 15 U.S.C. § 1116, as well as seizure and destruction of the counterfeit goods pursuant to 15 U.S.C. § 1118.


**VIII.  CONCLUSION**

In view of all of the foregoing, the Plaintiff respectfully urges the Court to return a verdict in its favor, to enter a significant damage award according to the

calculations shown above, and to grant the Plaintiff injunctive relief and seizure as requested.

Respectfully submitted this the 13th day of July, 2012.

**HARRINGTON LAW, P.C.**

By:  s/James M. Harrington
James M. Harrington, NCSB No. 30005
jharrington@harringtonlawpc.com
HARRINGTON LAW, P.C.
P.O. Box 403
Concord, NC 28026-0403
Tel: 704-315-5800
Fax:  704-625-9259
Attorney for the Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing paper is being filed on the date indicated below using the Clerk's CM/ECF system, which will send a Notice of Electronic Filing to counsel of record as follows:

KARL JEFFREY REYNOLDS - kjreynolds924@earthlink.net

VINCENT BRIAN LYNCH - vlynch@floridalawyer.com

STEVEN MITCHELL DEVER mitchdever@comcast.net

Service on the following CM/ECF non-participants is being made on the same date by depositing a copy of same as First Class Mail, postage prepaid, in envelopes addressed to:

```
ROBERT L. PAYNTER, SR.          KEVIN SHORETTE
9083 SEAFAIR LN                 PO BOX 1784
TALLAHASSEE FL 32317-8188       BRONSON FL  32621-1784
```

Date: July 13, 2012              s/James M. Harrington